UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
VINCENT WARREN,                                                  :
                                                                 :
                          Plaintiff,                             :
                                                                 :        03 Civ. 8736 (GEL)
        -against-                                                :
                                                                 :        **OPINION AND ORDER**
HARI CHAKRAVORTY and                                             :
DALE BISSONETTE,                                                 :
                                                                 :
                          Defendants.                            :
                                                                 :
-----------------------------------------------------------------x

Vincent Warren, *pro se*, Plaintiff.

Eliot Spitzer, Attorney General of the State of New
York, by Benjamin Lee, Assistant Attorney General
(of Counsel), for Defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff *pro se* Vincent Warren, currently an inmate at the Elmira Correctional Facility, brings this action for monetary relief under 42 U.S.C. § 1983 based on events that took place following a fall that occurred while he was an inmate at the Green Haven Correctional Facility in 2003. Plaintiff alleges that defendant Chakravorty failed to adequately treat an injury he suffered on January 2, 2003, that defendant Bissonette interfered with his medical treatment, and that Bissonette injured him through the use of excessive force. Plaintiff's second amended complaint, filed on May 25, 2004, asserted various claims against numerous defendants, but on August 31, 2004, this Court dismissed portions of plaintiff's complaint, leaving only plaintiff's claims against Chakravorty and Bissonette. Warren v. Purcell, No. 03 Civ. 8736 (GEL), 2004 WL 1970642 (Sept. 3, 2004). Discovery commenced thereafter with respect to the remaining

defendants, and was completed on August 31, 2005. Defendants now move for summary judgment on all of plaintiff's remaining claims. For the reasons below, defendants' motion will be granted in part and denied in part.

**BACKGROUND**

The parties paint two very different pictures of the relevant events. Both parties agree that Warren slipped and fell on some ice in the yard at Green Haven on January 2, 2003. Immediately following his accident, Warren was taken to St. Francis Hospital for treatment, diagnosed with a neck contusion or sprain, and discharged with instructions to rest, take over-the-counter pain medication, and seek follow-up treatment at the Green Haven clinic. (Def. R. 56.1 Stmt. ¶ 2.) The next day Warren, escorted by Bissonette, went to the Green Haven clinic for follow-up care. (Warren Dep. 70.) During this initial visit, Warren was treated by Chakravorty, a doctor at the clinic, though not Warren's primary care provider. (Def. R. 56.1 Stmt. ¶ 3.) It is at this point that the parties' versions of events begin to diverge.

According to defendants, the following events then took place. Chakravorty "conducted a thorough examination of plaintiff." (Id. ¶ 6.) He checked for spinal deformity, examined Warren for external injuries, and tested Warren's ability to walk on his heels and toes. (Chakravorty Decl. 3.) Following this examination, Chakravorty diagnosed Warren as suffering from a neck and back strain, and prescribed a muscle relaxant and an anti-inflammatory. (Id.) The examination was completely routine, thorough, and professional. (Id. ¶¶ 4-6.) At no time did Chakravorty scream at Warren or order Warren out of his office. (Id. ¶ 5.) After Chakravorty completed his examination and treatment, Warren left his office and went to the office of his primary care provider, Dr. Bendheim. (Def. R. 56.1 Stmt. ¶ 18.) However, because

2

Warren had a medical visit pass only to see Chakravorty, not Bendheim,[1] Bissonette entered Bendheim's office and "escorted" Warren out of the office,[2] without touching Warren "physically" and without any yelling or verbal abuse. (Id. ¶¶ 19, 22.)

Warren offers a different version of events. According to Warren, once he arrived at Chakravorty's office, he told Chakravorty that he was in pain and that he needed some pain medication. (Warren Dep. 71.) At the time, the pain in Warren's neck was so intense that he was crying. (Id. 75.) Warren noticed that his medical file was on the table, but Chakravorty did not look at the file while Warren was in the room, nor did he discuss the file with Warren. (Id. 71-72.) Instead, Chakravorty simply told Warren that "nothing is wrong with [him]," and to "get the hell out of his office." (Id.) Warren, however, remained in the office in an unsuccessful attempt to obtain some pain medication, until Bissonette entered Chakravorty's office, grabbed Warren by the shirt, and pulled him out into the hall. (Id. 74-76.) The entire visit lasted two minutes, in which time Chakravorty conducted no examination whatsoever. (Id. 71-72.)

According to Warren, as he was being pulled out of the office, Warren saw Bendheim walking down the hall. (Id. 76.) Once outside Chakravorty's office, Warren began walking slowly so that Bissonette, who was supposed to be escorting him out of the clinic, advanced

---

[1] Neither party explains why, if Bendheim was available and was Warren's primary care provider, Warren was issued a medical pass to see only Chakravorty.

[2] Defendants do not explain how Warren was able to separate himself from Bissonette and enter Bendheim's office if Warren was under Bissonette's supervision during his visit to the clinic. In Bissonette's affidavit – the only evidence submitted by defendants on the matter – he simply states that as he "walked over towards [Warren] in order to escort him back to [the cell] block," Warren began talking to Bendheim, and then "followed Dr. Bendheim into Dr. Bendheim's office." (Bissonette Decl. ¶ 4.) Bissonette does not explain how far away he was when he began "walk[ing] over towards" Warren, or how long Warren was in Bendheim's office before Bissonette removed him.

some distance ahead of him down the hall. (Id. 78.) After Bissonette got ahead of him, Warren went into Bendheim's office, sat down, and told Bendheim what had happened in Chakravorty's office. (Id.) Bendheim then left his office, retrieved and reviewed Warren's medical files, requested that a neck brace be obtained for Warren, and prescribed him some pain medication. (Id. 78-80.) Shortly thereafter, while Bendheim was telling Warren about the medication and while a nurse was putting the neck brace on Warren's neck, Bissonette entered the room and grabbed the brace in an attempt to pull it off his neck. (Id. 82.) Warren began screaming, and Bendheim stepped between Warren and Bissonette, argued with Bissonette, and ordered Bissonette out of the office. (Id.) Bissonette left, but then reentered and ordered Warren to leave the office. (Id. 83-84.) Warren obliged. He left the office with his neck brace, but without his medication, which was left behind. (Id.) Bissonette then escorted Warren back to his cell block without incident. (Id.)

## DISCUSSION

Summary judgment shall be granted if the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion,"Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996), and must refuse to make any credibility assessments or weigh the evidence, Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

4

To determine which facts are material, the Court must look to the substantive law that supplies the basis for the plaintiff's claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Here, Warren asserts a claim of inadequate medical treatment against Chakravorty and Bissonette, and a claim of excessive force against Bissonette. Each claim will be addressed in turn.

Because the parties present radically different version of the key events, and because the resolution of credibility issues is a matter for the factfinder, where the witnesses' accounts differ the Court must accept the version of the facts most favorable to Warren, the party opposing the motion.

I. Warren's Claims Against Chakravorty and Bissonette for Inadequate Medical Treatment

The Eighth Amendment protects against the "unnecessary and wanton infliction of pain," Hope v. Pelzer, 536 U.S. 730, 737 (2002), and its protection extends to the provision of medical care in our prison system, Estelle v. Gamble, 429 U.S. 97, 103 (1976); accord Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). Inmates are not free to seek out their own doctors or obtain their own private health insurance, and therefore it is the "government's obligation to provide medical care for those whom it is punishing by incarceration." Estelle, 429 U.S. at 103. To state a constitutional claim based on the denial of medical care, a plaintiff must satisfy both an objective and a subjective test. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" Id. at 66, quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991). Second, the accused prison official must have acted with deliberate indifference, such that he "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," Hathaway, 37 F.3d at 66.

A. The Objective Inquiry

Turning first to the objective inquiry, this Court's evaluation of the seriousness of Warren's claim "must be tailored to the specific circumstances" of the claim. Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003). In that regard, it is important to observe that Warren does not allege that he received no care for his injured back and neck, or that the care he received following his January 3, 2003, visit to the clinic was inadequate as a general matter. Indeed, Warren admits that he visited the Green Haven clinic to receive treatment numerous times after his fall – on January 7, 8, 13, 28, and 31, February 4 and 5, March 5, 21, and 28, April 8, 11, 14, 18, 22, 25, and May 2, 9, 13, 16, 20, and 30, 2003. (Warren Decl. ¶ 21.) Additionally, Warren admits that he received pain medication 72 hours after his fall, and that in March he began receiving physical therapy to assist his recovery at the direction of Bendheim. (Id. ¶¶ 19, 21.) Rather than alleging a general denial of treatment, Warren's complaint is specifically directed at his treatment at the hands of Chakravorty and the actions of Bissonette on January 3, 2003, the day following his accident. Warren states:

> I have a right to be free from cruel and unusual punishment. I also have a right to . . . adequ[ate] treatment medically. Dr. Bendhiem [sic] issued the neck brace, but I did not get any pain medication, it was given to plaintiff by Bendhiem [sic], but when Bissonetter [sic] ordered plaintiff to leave, not only did plaintiff leave, that medication was left as well. As a result, plaintiff went 72 hours without pain meds, now if that's not a good enough reason to complain, then what is? If a man in the free world slipped and injured his neck, if he was directed to a hospital, he would be seen and cared for . . . .

(Id. ¶ 23.) In sum, Warren appears to have no complaints regarding the treatment he received under Bendheim's care after January 3, 2003. Instead, Warren's claim is based on the pain he claims to have suffered as a result of Chakravorty's alleged refusal to properly treat him

6

following his injury and his ejection from Bendheim's office by Bissonette.

When a plaintiff's Eighth Amendment "claim is based on [a] short-term interruption[] in the otherwise adequate treatment which he [received] for his underlying medical condition," the inquiry regarding the seriousness of the injury should "focus on the challenged *delay* . . . in treatment rather than the prisoner's *underlying medical condition* alone." Smith, 316 F.3d at 185. However, this focus does not soften the requirement that the injury suffered must be sufficiently serious to warrant constitutional relief. In that regard, defendants argue that to meet the objective standard, the delay must actually result in a substantial affect on a plaintiff's future activities, must cause chronic pain (Def. Mem. 9), or must result in a risk of "death, degeneration, or extreme pain" (Def. Mem. 11). Defendants misstate the law.

In support of the requirements they assert, defendants rely on Brock v. Wright, 315 F.3d 158 (2d Cir. 2003), and Smith v. Carpenter. This reliance is misplaced. Brock does indeed list the existence of "chronic and substantial" pain as one factor to consider when evaluating the seriousness of a plaintiff's medical condition. 315 F.3d at 162. However, the Court of Appeals lists other factors as well, including "whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment." Id. (internal quotation marks omitted). Additionally, in the context of a plaintiff suffering from chronic pain, the Brock Court stated that "[w]e do not . . . require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one." Id. at 163.

Similarly, Smith fails to support the proposition defendants seek to extract from it. Smith does state, as defendants quote, that "the absence of present physical injury will often be

7

probative in assessing the risk of future harm." 316 F.3d at 188, see also Def. Mem. 11. However, earlier in the very same paragraph, the Court acknowledges "that actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." Id. In support of this statement, the Court of Appeals cites approvingly to White v. Napoleon, 897 F.2d 103, 111 (3d Cir. 1990), for the proposition that a "prisoner need not allege that his medical condition worsened in order to state a viable Eighth Amendment claim for denial of medical care." Smith, 316 F.3d at 188.

Contrary to defendants' assertions, the objective inquiry into the seriousness of Warren's injury cannot be resolved simply by observing that Chakravorty's treatment did not result in permanent harm or that at no point did Warren risk death. Rather, "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." Brock, 315 F.3d at 162. A fact-specific inquiry is required, and based on the evidence before the Court, taken in the light most favorable to Warren and drawing all inferences in his favor, a rational finder of fact could conclude that the deprivation Warren alleges was sufficiently serious to establish a constitutional violation.

On January 2, 2003, plaintiff had to be carried off on a stretcher after he slipped in the prison yard. (Bendheim Interogg. No. 2.) He was initially treated for a "cervical fracture" (id.), was diagnosed with a neck contusion or strain, and was directed by the staff at St. Francis Hospital to take pain medication and to follow up with more treatment at the Green Haven clinic. Certainly, if a patient were to appear in a doctor's office at the instruction of hospital staff following such an injury, a reasonable doctor would consider such a patient worthy of treatment. See Brock, 315 F.3d at 162. However, according to Warren, he received no treatment at all from

8

Chakravorty. Rather, he was told that nothing was wrong with him, and that he needed to leave. Warren asserts that Chakravorty provided him with no medication for his pain, despite the hospital's recommendation that he be given such medication, Warren's statement to Chakravorty that he was in pain, and Warren's crying in Chakravorty's office due to the pain's severity. Accordingly, if a finder of fact were to credit Warren's version of events, it could conclude that Chakravorty's refusal to treat Warren or to provide him with any pain medication subjected Warren to at least one day of additional severe and "unnecessary" pain, Hope, 536 U.S. at 737.

Under such circumstances, when an inmate has been diagnosed with an injury to his back and neck, when hospital staff have instructed the inmate to take pain medication, when an inmate is directed to a prison doctor's office to receive follow-up care, and when the inmate is in such pain during the visit that he is brought to tears, a doctor's refusal to provide any treatment or medication for the inmate – a refusal that denies the inmate any pain medication for at least a day[3] – constitutes a sufficiently serious deprivation to satisfy the objective prong of the inquiry.[4]

---

[3] Warren complains that he was without pain medication for 72 hours. However, that measure of time apparently refers to the total time between his injury and his eventual receipt of the medication. Warren admits that he received medication "within a day or two" of his visit to Chakravorty's office. (Warren Dep. 92.) Chakravorty cannot be faulted for any delay that occurred before he first saw Warren.

[4] In reaching this conclusion, the Court recognizes the overlap between the objective and subjective prongs of the inquiry. Under the subjective prong, the Court must evaluate the level and nature of a defendant's alleged indifference. However, the level and nature of a defendant's indifference is also relevant in evaluating the severity of the deprivation. Here, Warren asserts that, despite his injury and his pain, Chakravorty refused to treat him. Chakravorty's alleged refusal to offer any treatment certainly factors into a determination of his level of indifference, but it also goes to the severity of Warren's deprivation. Less indifference – if, for example, Chakravorty had simply given Warren an aspirin and told him to get out of the office – results in less deprivation – with the aspirin, Warren experiences less pain. The Court of Appeals has recognized this overlap, and acknowledges that certain evidence may be relevant to both the objective and subjective inquiries. See Smith v. Carpenter, 316 F.3d at 187 n.12 ("To some

Moreover, defendants do not claim that Warren's injury was so minor that it did not require treatment or medication. Indeed, defendants themselves admit that Warren received treatment for his injuries through May 2003, a full five months after his visit to Chakravorty. (Def. R. 56.1 Stmt. ¶ 9.) The fact that Warren's injury required five months of treatment belies defendants' argument that it was a "minor discomfort" unworthy of constitutional protection. (Def. Mem. 9-10.) Neither a skin rash nor a finger laceration – "insufficient" injuries to which defendants compare Warren's claim (id. 10) – necessitate five months of physical therapy.

Instead, defendants argue Warren has not established a constitutional violation because Chakravorty's affidavit and his notes indicate that he *did* in fact treat Warren on January 3. Essentially, defendants ask this Court to believe Chakravorty instead of Warren because Warren admits his memory is "flawed" and because Warren "completed only eleventh grade before going to prison." (Def. Mem. 12.) However, the Court must decline defendants' invitation to assess the witnesses' credibility. Weyant, 101 F.3d at 854. Our system of justice leaves that task to the jury, and when evaluating the two drastically different versions of events offered by Warren and Chakravorty, a jury could certainly credit Warren's version. If it did, it could find that the alleged deprivation was sufficiently serious.[5]

---

extent, the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination.")

[5] Contrary to defendants' assertions, Warren's description of the events of January 3 is not without corroboration in the record. Bendheim states that he treated Warren on January 3 because "[i]t appeared that plaintiff had an argument with Dr. Chakravorty and was told to leave his office." (Bendheim Interrog. No. 8.) This contradicts Chakravorty's statement that he did not order Warren out of his office. (Chakravorty Decl. ¶ 6.) In other respects, Bendheim contradicts Warren and supports Chakravorty, testifying, for example, that Bissonette did not enter his office and attempt to remove Warren's neck brace. (Bendheim Interrog. No. 9.) In any event, on this motion for summary judgment, it is not this Court's task to resolve these factual

B. The Subjective Inquiry

In addition to establishing the existence of a sufficiently serious deprivation, a plaintiff must demonstrate that the defendant official acted "with a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. To be sufficiently culpable, the defendant must act with deliberate indifference, a standard that "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Id. A defendant acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prisoner may state an Eighth Amendment claim "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 105.

With respect to Chakravorty, Warren has produced sufficient evidence to survive summary judgment. If a factfinder were to credit Warren's testimony, it could conclude that Chakravorty was aware of Warren's injury and his need for pain medication – either from a review of Warren's file, Warren's own statements to Chakravorty, or Warren's appearance. Additionally, under Warren's version of events, Chakravorty's demand that Warren "get the hell out of his office" is nothing if not deliberate. Accordingly, a finder of fact could conclude that Chakravorty was aware of Warren's pain and injury, and that Chakravorty deliberately refused to treat him.

---

disputes. That duty is left to the finder of fact.

The same cannot be said for Bissonette. While Warren complains that Bissonette cut short his visit with Bendheim, the record contains no evidence from which a finder of fact could conclude that Bissonette intentionally interfered with Warren's medical care. To the contrary, Bissonette escorted Warren to Chakravorty's office for the sole purpose of obtaining treatment. Even if a factfinder were to conclude that Warren did not receive any treatment from Chakravorty, there is no evidence to support the conclusion that *Bissonette* was aware of this lack of treatment, or that Bissonette intended to stop Warren from receiving necessary treatment. Rather, Bissonette permitted Warren to stay with Chakravorty for as long as the appointment lasted. Bissonette only interfered with Warren's treatment after Warren left Chakravorty's office and went into Bendheim's office. However, Warren concedes that his January 3 appointment was to see Chakravorty, not Bendheim, and while Warren claims that his visit with Bendheim was not "without permission" because Bendheim himself permitted it (Warren Reply Bissonette Decl. 12), Warren does not dispute that his visit with Bendheim was against prison policy. Similarly, Warren concedes that Bissonette removed him from Bendheim's office because, in Bissonette's opinion, that visit was unauthorized. With respect to the pills left behind in Bendheim's office, Warren does not assert that Bissonette intended to deprive him of his pain medication, nor does the record support such a conclusion. Accordingly, there is no evidence in the record from which a factfinder could conclude that Bissonette intended to interfere with Warren's prescribed medical treatment, and therefore Warren's claim of inadequate medical treatment with respect to him will be dismissed.

II. Warren's Claim Against Bissonette for Excessive Force

When a plaintiff asserts a claim against a prison guard for excessive use of force, the Eighth Amendment requires that courts evaluate the claim using a two prong inquiry similar to that which was discussed above in connection with Warren's medical treatment claims. However, in the context of an excessive force claim, the objective prong of the inquiry does not require any particular "quantity of injury," for "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." Hudson v. McMillian, 503 U.S. 1, 9 (1992). Thus, in cases of deliberate use of force, the subjective inquiry predominates: the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6-7. The objective inquiry is not completely without teeth, however, for the Eighth Amendment "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 8-9; accord Branham v. Meachum, 77 F.3d 626, 630 (2d Cir. 1996).

On the record before the Court, a reasonable factfinder could conclude that Bissonette "maliciously and sadistically" caused harm to Warren. According to Warren, Bissonette entered Bendheim's office and immediately began to pull at Warren's neck brace. (Warren Dep. 82.) As discussed above, Warren's visit to Bendheim was unauthorized, and therefore Bissonette had a legitimate reason for attempting to remove Warren from Bendheim's office. While Bissonette's purpose was permissible, a finder of fact could determine that his methods were not. First, with respect to the objective inquiry, Warren testifies that "Bissonette did cause plaintiff pain by pulling his neck brace" (Warren Reply Bissonette Decl. 13), and that Bissonette's

13

actions caused him to scream (Warren Dep. 82). In addition to Warren's own testimony, the record is clear that Warren was diagnosed with a neck contusion or sprain, a condition that presumably would exacerbate the pain resulting from any trauma to the region. Accordingly, a factfinder could conclude that the pain he suffered while allegedly Bissonette pulled on his neck brace was more than de minimis.

Warren has also produced sufficient evidence to satisfy the subjective inquiry. The record contains no direct evidence of malice or wantonness with respect to Bissonette's removal of Warren from Bendheim's office. However, based on Warren's allegation that Bissonette pulled on Warren's neck brace, a finder of fact could infer that Bissonette acted with malice and an intent to injure Warren. Based on Warren's unauthorized presence in Bendheim's office, a finding that Bissonette forcibly removed Warren from the office would not, by itself, support the conclusion that Bissonette acted with the necessary malice. However, Warren claims that Bissonette grabbed him by the neck brace – the very site of his injury. If a factfinder were to conclude that Bissonette intentionally pulled on Warren's neck brace in an attempt to remove him from Bendheim's office, the factfinder could then infer that Bissonette's decision to pull on the neck brace, as opposed to on Warren's arm or shoulder, resulted from an attempt to injure Warren, and to cause additional and unnecessary pain to a part of his body that had already been injured.

III. Defendants' Claims of Immunity

Defendants' claims of immunity from suit based on the doctrine of qualified immunity and the Eleventh Amendment merit only brief discussion. Defendants assert that Chakravorty is protected by qualified immunity because "it was objectively reasonable for him to treat plaintiff

14

with [certain drugs]." (Def. Mem. 20.) The question, however, is not whether Chakravorty's actions were objectively reasonable based on Chakravorty's own version of his actions. Not surprisingly, under Chakravorty's description of events, his actions were eminently reasonable. Rather, the question is whether Chakravorty's actions were objectively reasonable based on the record viewed in the light most favorable to Warren and with all inferences drawn in Warren's favor. Under that standard, Chakravorty's alleged complete refusal to examine or treat Warren at all would not be reasonable, and immunity would not apply.

With respect to the Eleventh Amendment, defendants are correct that the Eleventh Amendment bars suits for damages under § 1983 against state officers in their official capacity. Posr v. Court Officer Shield #207, 180 F.3d 409, 414 (2d Cir. 1999). However, suits against state officers in their individual capacities are not barred. Id. Accordingly, to the extent that Warren has asserted claims against Chakravorty or Bissonette in their official capacities, those claims will be dismissed.

## CONCLUSION

Defendants' motion for summary judgment (Doc. #44) is granted with respect to Warren's claims against Bissonette for inadequate medical treatment, and denied with respect to Warren's claims against Chakravorty and with respect to Warren's claims against Bissonette for excessive force. Defendants' motion is granted with respect to Warren's claims against both defendants in their official capacities.

SO ORDERED.

Dated: New York, New York
       July 25, 2006

_____
GERARD E. LYNCH
United States District Judge